**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-6551**

RICHARD L. MCLEOD,

              Petitioner - Appellant,

      v.

JAMES V. PEGUESE, Warden,

              Respondent - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Andre   M.   Davis,   District   Judge.
(1:05-cv-01589-AMD)

Argued:  October 28, 2008          Decided:  July 22, 2009

Before WILKINSON   and   AGEE,   Circuit   Judges,   and   John   T.
COPENHAVER, Jr., United States District Judge for the Southern
District of West Virginia, sitting by designation.

Affirmed by unpublished opinion.   Judge Copenhaver wrote the
opinion, in which Judge Wilkinson and Judge Agee joined.

**ARGUED:** Mitchell Scott Ettinger, SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, L.L.P., Washington, D.C., for Appellant.   Edward John
Kelley, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore,
Maryland, for Appellee.   **ON BRIEF:** Douglas F. Gansler, Attorney
General of Maryland, Baltimore, Maryland for Appellee.

Unpublished opinions are not binding precedent in this circuit.

COPENHAVER, District Judge:

On October 27, 1992 a Maryland jury convicted Richard Lawton McLeod of the murder of Jacqueline Roberson. He was sentenced to life in prison without the possibility of parole. The Court of Special Appeals of Maryland affirmed his conviction on June 21, 1993, and his sentence on August 26, 1994. McLeod's petition for a writ of certiorari was denied by the Maryland Court of Appeals on December 16, 1994. His petition for post-conviction relief to the Circuit Court for Prince George's County, where he had been convicted, was denied on February 25, 1998; leave to appeal was also denied. On July 16, 2001 McLeod filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus with the United States District Court for the District of Maryland, which was denied as being time-barred.

Arguing that new evidence had been discovered that ought to have been disclosed to him by the State under Brady v. Maryland, 373 U.S. 83 (1963), McLeod returned to the Circuit Court for Prince George's County and filed a motion to re-open his post-conviction proceedings on April 22, 2003. Following a two-day evidentiary hearing in January, 2004, that court issued a statement of reasons, which included findings of fact, denying the motion.

On June 1, 2005 this court granted McLeod's motion for authorization to file a second or successive § 2254 petition for

a writ of habeas corpus. See 28 U.S.C. § 2244(b)(3)(A). Following a non-evidentiary hearing, the district court, on March 30, 2007, dismissed the petition with prejudice. McLeod v. Peguese, 482 F. Supp. 2d 658 (D. Md. 2007). The district court did grant McLeod's application for a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A). This appeal ensued.

Because McLeod has failed to meet the threshold requirement of 28 U.S.C. § 2244(b)(2)(B)(ii), his successive § 2254 petition must be dismissed. That is, McLeod has failed to show that the facts underlying his due process Brady claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty of murder. See § 2244(b)(2)(B)(ii).

Proceeding nevertheless to the merits, as did the district court, McLeod has not shown that the Circuit Court for Prince George's County made an objectively unreasonable determination of the facts in light of all the evidence presented to it, or that it unreasonably applied clearly established federal law as determined by the Supreme Court of the United States. See § 2254(d).

We affirm.

3

I.

Jacqueline Roberson, then twenty-eight years old, was last seen waxing her car off to the side of Governor's Bridge Road near the entrance to Izaak Walton League Park in Bowie, Maryland on August 10, 1987. Three days later Roberson's nude body was discovered in a wooded area approximately three hundred feet from the road. Her body was found under leaves and branches, face down, with her hands underneath her body and her legs spread apart. Roberson's clothing, consisting of a white strapped t-shirt, a navy blue cut-off t-shirt and a pair of light blue jeans which had been cut off and made into shorts, were found next to her body. Her undergarments were found beneath her. The cause of death was determined to be two stab wounds to the abdomen, which had not been inflicted through the clothing. There was no evidence of vaginal or anal penetration, and an autopsy failed to reveal the presence of semen in or on her person.

A red "WMZQ, Country FM" bandana and a knife were found at or near the crime scene. Hair found on the bandana, which was next to Roberson's body, was determined to be that of a cat. No fingerprints or blood residue were found on the knife, which was discovered on the unpaved shoulder of Governor's Bridge Road approximately one-hundred and fifty feet east of the entrance to Izaak Walton League Park. Six latent fingerprints were

4

discovered on Roberson's car, none of which have been identified.

On August 13, 1987, the same day Roberson's body was discovered, McLeod was arrested for the rape of fifteen year old Lori Webb. Webb was raped in her home earlier that day, and at the time of the rape was wearing a purple shirt and white shorts with thin red stripes. McLeod subsequently pled guilty to raping Webb and was sentenced to forty years in prison with fifteen years suspended.

Detective Robert Edgar, and other members of the Prince George's County Police Department ("PGPD"), interviewed a number of prospective witnesses and suspects in connection with the Roberson murder between August 13, 1987 and February 1, 1988. During this time, members of the PGPD interviewed Pamela Sue Fike. Fike informed the PGPD that she was told by her brother, Christopher Fike, that Harold Freese told him that "the Saunders" were at Governor's Bridge Road on August 10, 1987. Pamela Fike's brother also told her that he believed the Saunders may have killed Roberson because "they are the type that may do something like that." Fike's statement was memorialized in an undated, but signed, witness statement.

On August 15, 1987, two days after McLeod's arrest for the rape of Webb, his mother, Barbara Bricker, found a pair of shorts in McLeod's room with a wax-like substance in the crotch

area. She immediately contacted the PGPD. Detective Edgar went to Bricker's home where he was given the shorts and other items of McLeod's clothing. At this point, McLeod became a suspect in the Roberson murder.

Edgar first interviewed McLeod regarding Roberson's murder on February 1, 1988 at the Prince George's County Detention Center ("Detention Center"). During the interview, McLeod denied any involvement in, or knowledge of, the murder and provided a written statement. On that same day, and despite his denials, McLeod was charged with the murder of Roberson and related offenses. The following month, however, in March of 1988, the charges were *nolle prossed*.

Following withdrawal of the charges against McLeod, the Roberson murder investigation remained at a standstill for more than two years. At some point in 1991, Edgar decided to once again actively pursue the case, enlisting the assistance of Detective Douglas LaFoille to that end. During the summer of 1991, Edgar and LaFoille asked one of McLeod's acquaintances to send McLeod a letter designed to elicit an admission from McLeod regarding his involvement in the Roberson murder. Upon receipt of the letter, McLeod demanded that the letter's true author contact him.

During an October 2, 1991 interview conducted by Edgar and LaFoille, McLeod again denied any involvement in the Roberson

6

murder. McLeod told the detectives that after being charged in February of 1988, he was approached by a fellow inmate named "Rick." McLeod said that Rick, who was later determined to be Richard Nelson, told him that he knew that McLeod had not murdered Roberson and that he knew who did. At the time of the interview, McLeod told the detectives that Nelson had provided the name of Roberson's killer, but McLeod could not recall the name. Some 12 years later, however, during the circuit court's hearing in 2004 on McLeod's motion to re-open the post-conviction proceedings, McLeod testified that Nelson stated that the murderer's name was "Brian." Nelson allegedly told McLeod that Roberson was killed because she happened upon a drug deal and was "in the wrong place at the wrong time." McLeod informed the detectives that Nelson had refused to speak with authorities and would deny ever having discussed the murder. McLeod also provided two written statements, one setting forth what he could recall of his conversation with Nelson, and the other regarding his whereabouts on the day of Roberson's murder.

Nelson was known by the PGPD and the State's Attorneys Office to be a violent man with an extensive criminal history. Following the 1991 interview with McLeod, the PGPD undertook extensive efforts to locate him. At the time, the PGPD believed Nelson was either a suspect, or a material witness, in the Roberson murder. In furtherance of the effort to locate

7

Nelson, Edgar and LaFoille sought the assistance of state, federal and international law enforcement agencies. The detectives also contacted Nelson's family members, friends and acquaintances. In the fall of 1991, LaFoille was in contact with Nelson's ex-wife, Karen Clark. As will be seen, the extent of the contacts, and the information exchanged between LaFoille and Clark, are in sharp dispute. Ultimately, the efforts to locate Nelson were to no avail. He was never found and his whereabouts remain unknown.

In April of 1992, McLeod was indicted for Roberson's murder. Prior to trial, defense counsel moved to compel discovery, complaining that the State had not complied with its obligations under Brady. The trial court directed the State to produce any witness statements arguably containing exculpatory information. In an attempt to comply with the court's directive, the lead prosecutor, Laura Gwinn, sent defense counsel a letter. The letter made no reference to Nelson's ex-wife, Karen Clark, and failed to disclose that the state possessed Pamela Fike's written statement regarding what she had been told by her brother. The State did, however, provide the defense with a list of prosecution witnesses containing eighty-three names, including Fike's. The defense attempted to locate Fike, but was unable to do so.

8

Beginning on October 21, 1992, McLeod was tried before a jury for the murder of Roberson and carrying a dangerous weapon openly with the intent to injure. The State presented evidence that McLeod owned a bandana and a knife like those found at the scene. The State also showed that McLeod lived in a home with cats, which, according to the State, explained why cat hair was found on the bandana. Members of McLeod's family testified that when they visited him at the Detention Center following his arrest for the rape of Webb, they asked why he had been arrested. According to McLeod's step-father, William Bricker, McLeod responded "rape, murder, something." McLeod's mother testified that McLeod responded by asking "was it murder, was it rape or what? He seemed very confused." McLeod's mother and step-father testified further that when asked how he could rape a fifteen year old, McLeod responded, "I thought she was older." When asked by his family to describe his victim's clothing, McLeod stated, according to his step-father, "[a] blue pullover and blue shorts," and according to his mother, "a pullover and navy blue shorts." The parties stipulated that Webb, who broke down in front of the jury and could not complete her testimony, would testify that she was raped in her home by McLeod on August 13, 1987, and would have identified her clothing. The clothing Webb was wearing at the time of her rape was admitted into evidence.

9

The State offered, and the court admitted, the shorts smudged with car wax recovered from McLeod's room. The Turtlewax® brand of car wax found on McLeod's shorts was shown to be the same brand of wax used by Roberson the day of her murder. McLeod would typically wax his step-father's racecar once every two weeks, and the police recovered a container of Turtlewax® from McLeod's home. There was a dispute as to the last time McLeod waxed his own car, and washed his clothing, prior to the murder. McLeod's mother testified that she believed McLeod had waxed his car on August 7, 1987. The State also offered evidence that McLeod gave his step-father conflicting alibis regarding his whereabouts the night of Roberson's murder.

The State argued that McLeod may not have acted alone in murdering Roberson. At trial, the defense specifically referenced other possible suspects, namely, Brian Rose and Wayne Hurley. Upon being called by the defense, Rose invoked his Fifth Amendment rights and refused to answer any questions. In closing, the State made reference to the defense's claim that Rose murdered Roberson, stating "[w]e heard a lot about Brian Rose. . . . We heard that he has a red and white striped bandana. We heard from his mom that he had a cat." Based on the forgoing, the State argued that the defendant had not offered a reasonable hypothesis of innocence, and that based on

10

all the evidence, which cumulatively tended to show that McLeod was involved in Roberson's murder, he should be found guilty.

The defense argued, among other things, that in light of the State's theory that McLeod may not have been the one wielding the knife, and because the evidence did not suggest that Roberson was killed during the course of an attempted rape, McLeod was not guilty of felony murder. The defense also argued that other people were seen near the crime scene with red WMQZ bandanas, and that the evidence implicated Rose to the same extent as McLeod. In sum, the defense argued that the State had not met its burden of proof. On October 27, 1992, the jury convicted McLeod of first degree felony murder and carrying a dangerous weapon openly with intent to injure. McLeod's requests for post conviction relief on the murder charge failed.

In March of 2001, nine years after his conviction, McLeod requested that the red bandana and cat hairs recovered from the scene be tested for DNA. The State, however, had destroyed those items, McLeod's shorts, Roberson's clothing, and the latent fingerprints taken from Roberson's car.


II.

According to Karen Clark, she and Detective LaFoille were in contact on numerous occasions in the fall of 1991. Clark maintains that over the course of these contacts she informed

11

LaFoille of the following, which constitutes the core of the Brady claim: Nelson was a violent drug addict; during the summer of 1987 Nelson gave their son Richard Nelson III a red WMZQ bandana and Nelson owned a matching bandana; at some point during the summer of 1987 Nelson demanded the return of their son's bandana;[1] Nelson was adamant that the bandana be returned but would not tell Clark why; during the summer of 1987 she met with Nelson and gave him the son's bandana; Nelson carried knives and his favorite knife was wooden handled with brass fittings, similar to the one found on the shoulder of Governor's Bridge Road not far from where Roberson's body was discovered; when she saw Nelson during the summer of 1987 she noticed that he had a new knife and upon inquiry Nelson told her that he had lost his favorite knife; and that Nelson had told her, before they married in 1983, that he was present when a young woman named Donna Dustin was murdered on November 17, 1973 in Anne Arundel County. According to Clark, Nelson stated that Dustin's head had been slammed into the bumper of a car and that his knife was used during the assault. Dustin's body was found

---

[1] Nelson was in a relationship and had a child with a woman named Virginia Acree who testified to the circuit court on January 13, 2004 that during the summer of 1987, Nelson occasionally stayed with her at her apartment in Frederick, Maryland.

12

approximately three miles from the spot where Roberson's body was found.

On August 16, 2002, Clark wrote to McLeod in prison requesting the name and contact information of his attorney. McLeod complied with her request and on August 23, 2002 Clark met with McLeod's counsel, Mitchell Ettinger. In addition to the information allegedly provided to Detective LaFoille, Clark told McLeod's attorney that Nelson frequented Rips, a restaurant where Roberson worked during the summer. Clark also stated that Nelson was associated with Neil Vaughn, one of three individuals who acknowledged being near the crime scene the day of Roberson's murder. Clark further informed counsel that during the summer of 1987, Nelson lived with his then girlfriend Virginia Acree and that Clark had received items from Nelson that summer with cat hair on them. Clark provided a business card containing the notation, "Hyattsville Chapter Izaak Walton League." The business card was allegedly from Nelson's briefcase, and the notation allegedly in Nelson's handwriting. Finally, Clark told counsel not only of the Donna Dustin murder, but also that in the fall of 1980, prior to her 1983 marriage to Nelson, he took her to a wooded area in Bowie, Maryland which he referred to as his "shrine." At the "shrine," Nelson asked Clark to lie on the ground and pose "in some particular position." Clark, who was under the impression Nelson wanted

13

her to pose in the nude, refused and walked away. Upon turning to look back, Clark saw Nelson masturbating.

Following receipt of this information, McLeod's attorney contacted Acree who confirmed that Nelson stayed with her during the summer of 1987. Acree stated that she owned a cat at the time and that Nelson owned a number of bandanas, most of them red. Acree also confirmed that Nelson was a violent man, and that during the summer of 1987, he frequently used drugs.

As a result of this new information, on April 22, 2003 McLeod filed a motion in the Circuit Court for Prince George's County to re-open his post-conviction proceedings. The motion requested that the court hold an evidentiary hearing regarding alleged Brady violations. McLeod argued that the State failed to disclose favorable and material information to the defense in the form of Clark's statements to Detective LaFoille. On September 4, 2003 the circuit court scheduled an evidentiary hearing. By order dated December 23, 2003, the court directed the State and PGPD to produce all witness statements taken in connection with the Roberson murder investigation. The only statements produced were created on or before February 1, 1988. The State confirmed that all evidence of the police investigation and all prosecution files created after that date had been lost or destroyed. The State did retain and produce witness statements taken in connection with its initial 1987

14

investigation into the Roberson murder, including the statement of Fike. Thus, in January of 2004, McLeod learned for the first time of Pamela Fike's statement that her brother had heard that "the Saunders" were at Governor's Bridge Road on August 10, 1987, and that her brother had speculated that "the Saunders" may have been involved in Roberson's murder because "they are the type that may do something like that."

In January of 2004 the circuit court held an evidentiary hearing on McLeod's motion to re-open the post-conviction proceedings. The court heard testimony from, among others, McLeod, Clark, Acree, Gwinn, Edgar and LaFoille. Testimony was also received from the Chief Investigator of the Anne Arundel County State's Attorneys Office, David Cordle. In the course of her continuing quest to learn of Nelson's whereabouts, Clark became aware that Cordle was interested in the 1973 murder of Donna Dustin. Besides the Roberson murder, Clark believed Nelson was involved in a number of other murders, and in late 1998 or early 1999 she had contacted Cordle to discuss the murders of Dustin and a woman named Jeany Kline. Clark contacted Cordle again in December of 2000, and on February 9, 2001 Cordle spoke with Detective LaFoille. At the hearing numerous inconsistencies emerged regarding the content of the conversations of each Clark and Cordle with LaFoille. See infra pp. 29-34.

15

In its July 11, 2004 statement of reasons, the circuit court concluded that,

> [w]hen examining the totality of the circumstances and evidence presented at the hearing, as it relates to the credibility of Karen Clark and Detective Douglas LaFoille, the Court finds Detective LaFoille to be the more credible witness. Consequently, the Court finds further that no information linking Richard Nelson to the murder of Jacqueline Roberson was provided by Karen Clark to Detective LaFoille in the Fall of 1991 or at any time pertinent to the Defendant's claim. . . . [T]he Court finds that the statement of Pamela Sue Fike, although arguably favorable, was not provided to the defense. As to its materiality, however, it is non-existent and the Court so finds.

State v. McLeod, No. CT92-0611X, slip op. at 25 (Md. Cir. Ct. Prince George's County June 11, 2004).

In the second § 2254 petition heard by the district court, McLeod contends that the circuit court unreasonably concluded that the State did not withhold exculpatory information in the form of Clark's statements to Detective LaFoille and erred as a matter of law in finding Fike's statement to be immaterial. On March 30, 2007, following a non-evidentiary hearing, the district court dismissed McLeod's petition by memorandum opinion. McLeod, 482 F. Supp. 2d 658.

III.

We review the district court's dismissal of McLeod's petition for a writ of habeas corpus de novo. See McNeil v. Polk, 476 F.3d 206, 210 (4th Cir. 2007); Buckner v. Polk, 453

16

F.3d 195, 198 (4th Cir. 2006); see also LeFevers v. Gibson, 238 F.3d 1263, 1266 (10th Cir. 2001).

A.

A successive habeas corpus petition such as McLeod's cannot be filed without first obtaining pre-filing authorization ("PFA") from the court of appeals. See 28 U.S.C. § 2244(b)(3)(A); In re Williams, 330 F.3d 277, 279 (4th Cir. 2003). In granting McLeod's PFA motion, this court determined that McLeod made a "prima facie showing" that the claims in his petition satisfied the requirements of § 2244(b)(2)(B). See § 2244(b)(3)(C). In pertinent part, § 2244(b) provides,

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--
>
> . . . .
>
> > (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
> >
> > (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

§ 2244(b)(2). In this circuit as in others, "prima facie showing" is understood to mean, "a sufficient showing of possible merit to warrant a fuller exploration by the district

17

court. . . . If in light of the documents submitted with the [PFA motion] it appears reasonably likely that the [motion] satisfies the stringent requirements for the filing of a second or successive petition, we shall grant the [motion]." Williams, 330 F.3d at 281 (quoting Bennett v. United States, 119 F.3d 468, 469-70 (7th Cir. 1997)). The grant of a PFA motion, however, is "tentative in the following sense: the district court must dismiss the motion that we have allowed the applicant to file, without reaching the merits of the motion, if the court finds that the movant has not satisfied the requirements for the filing of such a motion." Bennett, 119 F.3d at 470 (citing § 2244(b)(4)).

Enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which "greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications," § 2244(b)(2)(B) is "one of two narrow exceptions" to the rule that a claim not presented in an earlier § 2254 petition must be dismissed.[2] Tyler v. Cain, 533 U.S. 656, 661 (2001). The district court held, and the parties do not dispute, that McLeod could not have discovered Clark's alleged communication with

---

[2] The other narrow exception, found in § 2244(b)(2)(A) for certain claims based on new rules of constitutional law, does not apply here.

18

Detective LaFoille prior to August of 2002. Similarly, McLeod had no means of discovering the existence of Fike's written statement prior to January of 2004 when it was produced by the State. The district court, therefore, correctly found that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." § 2244(b)(2)(B)(i).

In order to "squeeze through the narrow gateway" created by § 2244(b)(2)(B), Felder v. McVicar, 113 F.3d 696, 698 (7th Cir. 1997), McLeod was also required to prove to the district court that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(B)(ii). If McLeod failed to make such a showing, the district court was obliged to dismiss the petition without reaching the merits. Section 2244(b)(4) directs that "[a] district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." See United States v. Winestock, 340 F.3d 200, 205 (4th Cir. 2003) ("When the application is thereafter submitted to the district court, that

19

court must examine each claim and dismiss those that are barred under § 2244(b) . . . ."). Respect for the finality of criminal judgments provides the impetus for the heavy burden placed on successive § 2254 petitioners by § 2244(b)(2)(b)(ii). See Calderon v. Thompson, 523 U.S. 538, 558 (1998) ("Section 2244(b) . . . is grounded in respect for the finality of criminal judgments."). While noting this requirement, the district court proceeded to the merits of McLeod's petition without applying § 2244(b)(2)(B)(ii) to the underlying facts.

Under § 2244(b)(2)(B)(ii), a petitioner must not only show that reasonable doubt exists in light of the new evidence, but that no reasonable juror would have found him guilty beyond a reasonable doubt. Thus, the question initially to be resolved is, assuming the information allegedly disclosed by Clark to LaFoille had been turned over to the defense, and Fike's statement was also disclosed, whether this new evidence, viewed in conjunction with all the evidence, clearly and convincingly establishes that no reasonable fact finder would have found McLeod guilty.

In an attempt to shoulder his heavy burden and satisfy § 2244(b)(2)(B)(ii), McLeod characterizes the State's case at trial as extremely weak and entirely circumstantial. He first points to the fact that the initial charges against him were *nolle prossed*, and contends that the evidence that was deemed

20

insufficient when the initial charges were dropped in February of 1988, was the same evidence relied upon when he was indicted in April of 1992. McLeod also argues that the primary evidence relied upon by the State to tie him to Roberson's murder was the red bandana with cat hair on it, and the knife. According to McLeod, the defense, through Clark, would have established the following, taken verbatim from McLeod's brief:

• During the summer 1987, Nelson possessed *two* red WMZQ bandanas, one that he wore and one that he gave to his and Clark's minor son.

• During the summer 1987, Nelson demanded that Clark take the WMZQ red bandana from her son and return it to Nelson, and that Clark complied.

• Nelson possessed and wore on his belt a wood-handled knife with brass fittings on each end, matching *exactly* the description of the knife found at or near the crime scene.

• During the summer 1987, Clark noticed that Nelson had a new knife and when she inquired what happened to old knife, he told her that he had "lost it."

• During the summer 1987, Nelson lived with a woman named Virginia Acree, who has confirmed that she lived with Nelson and that she owned a cat having the *same* color fur as the cat hairs found on the red WMZQ bandana. Acree also confirms that Nelson regularly wore red bandanas.

• Nelson had a long history of violence, particularly toward women, and during the summer 1987 was heavily using drugs.

• Nelson took Clark to a wooded area in Bowie, Maryland, which Nelson call his "shrine," and asked her to lie on the ground naked while he masturbated. This sexual practice is consistent with the crime scene evidence presented by the State, namely that Roberson disrobed *before* being stabbed, that her

21

clothes were found folded underneath her body, and that there was no evidence of physical rape trauma or the presence of seminal fluid on or in the victim.

• The wooded area Nelson referred to as his "shrine" is within three miles of where Roberson was murdered and is the very location where Dustin's nude and beaten body was found in 1973. Nelson admitted to Clark to having "wailed on" Dustin with a knife and accurately described injuries to Dustin that were never released to the public.

• Nelson frequented a restaurant in Bowie, Maryland known as Rips and was known to spend a considerable amount of time there. Roberson, a school teacher, worked at Rips during the summer months as a waitress, thus providing a possible social nexus that never existed between the victim and any putative suspect, including McLeod.

• Nelson was a friend to Neil Vaughn, who acknowledged to police that he was in Izaac Walton Park on the day that Roberson was murdered.

• Nelson possessed a business card on which *he wrote* the name of the park where Roberson was last seen waxing her car.

(McLeod's Opening Br. at 29-30) (emphasis in original). McLeod contends that had he been advised of the statements Clark says she made to LaFoille, the defense would have been able to "train the beacon directed at McLeod upon Nelson" who McLeod claims is the more likely perpetrator of Roberson's murder. (McLeod's Reply Br. at 9).

The State argues that even assuming McLeod's factual allegations are true, they do not satisfy § 2244(b)(2)(B)(ii). While admitting that a red bandana with cat hair, and a knife, were part of the State's case at trial, the State argues that

22

other evidence clearly implicated McLeod in Roberson's murder. That evidence being: when asked by his family the reason for his arrest following the Webb rape, McLeod replied that it was either rape or murder; Roberson was 28 years old when she was murdered, Webb was 15 at the time of her rape, and when informed of Webb's age following his arrest for her rape, McLeod responded by saying he thought she was older; when asked by his family to describe his victim's clothing, McLeod's description matched Roberson's blue clothing, not Webb's purple and white clothing; McLeod was placed in the vicinity of the murder the day it was committed by the pair of shorts smudged with the same brand of wax Roberson used to wax her car; and McLeod gave conflicting alibis to his step-father. (State's Resp. Br. at 22-24). In reply, McLeod notes that he waxed his step-father's race car frequently, and that none of the fingerprints on Roberson's car were his. He points out that the allegedly conflicting alibis were regarding his whereabouts the evening of August 10, 1987, while Roberson was murdered in the afternoon. McLeod characterizes his statement that he thought his victim was older as unremarkable and defensive.

With respect to his victim's clothing, McLeod contends that the record does not support the inference the State sought to draw at trial. Yet, the evidence was as follows. The day of her rape, Webb was wearing a purple shirt and white shorts with

23

thin red stripes. An evidence technician testified that at the time of her murder, Roberson was wearing a navy-blue t-shirt with the sleeves cut off, a white strapped t-shirt and a "pair of light blue jeans." (J.A. at 190-91). McLeod's mother testified that McLeod indicated his victim was wearing "a pullover and navy blue shorts." (J.A. at 119). McLeod's step-father testified that McLeod "mentioned blue. A blue outfit," and upon further questioning stated a "blue pullover and blue shorts." (J.A. at 98-99). While not an exact description of Roberson's clothing, McLeod's response is more likely a description of Roberson's predominantly blue outfit as opposed to Webb's outfit of purple and white.

McLeod attempts to diminish the incriminating force of his uncertainty regarding whether he had been arrested for rape or murder by noting that his mother testified he appeared disoriented at the Detention Center. Having been asked whether she visited McLeod at the Detention Center following his August 13, 1987 arrest, Mrs. Bricker testified: "We did. And there was a lot of confusion during that time." (J.A. at 117). She also testified that when McLeod was asked what he had been arrested for, McLeod "asked was it murder, was it rape or what? He seemed very confused." (J.A. at 118). McLeod, though, was not a suspect in the Roberson murder until August 15, 1987, when his mother provided Detective Edgar with his wax smudged shorts.

24

McLeod's being "confused" does not explain away the incriminating fact that he included murder, along with rape, as a possible reason for what was his rape arrest.

The only mention of the effect of Fike's statement on the § 2244(b)(2)(B)(ii) inquiry is the State's contention that its limited evidentiary value is self-evident. Fike's statement regarding what her brother told her, which was what someone else told him –- namely, that the Saunders were at Governor's Bridge Road on the date that Roberson was murdered -- is the epitome of inadmissible hearsay. See Md. R. Evid. 5-802. McLeod has offered no evidence that "the Saunders" were involved in the Roberson murder, and the mere speculation of Fike's brother that the Saunders "are the type that may do something like that" is sheer conjecture. The circuit court's conclusion that the materiality of Fike's statement is "non-existent" is supported by the fanciful nature of the statement. McLeod, No. CT92-0611X, slip op. at 25.

Undoubtedly, accepting Clark's assertions regarding what she told Detective LaFoille in the fall of 1991 as true, and assuming that the information had been turned over to the defense, McLeod could have attempted to show that Nelson murdered Roberson. That a jury would have been convinced that Nelson was the perpetrator, and McLeod was not involved, is far from a foregone conclusion. Even assuming Clark's testimony was

25

believed, it would not negate the several incriminating statements made by McLeod at the Detention Center. Still, a reasonable juror may well have found that the evidence regarding Nelson created enough doubt as to McLeod's guilt to acquit him. This, however, does not satisfy § 2244(b)(2)(B)(ii). McLeod's burden was to show, by clear and convincing evidence, that no reasonable juror would have found him guilty; not merely that it is conceivable that he could have been acquitted. The evidence that would have been received at trial as a result of the information Clark claims to have conveyed to LaFoille does present an alternative theory of Roberson's murder. Yet, as the state has pointed out, it would not have rebutted or called into question much of the State's case against McLeod.

Even accepting as proven fact the evidence allegedly provided by Clark, and that to which it leads, such evidence would be insufficient, when viewed in light of the evidence as a whole, to establish by clear and convincing evidence that no reasonable juror would have found the defendant guilty. McLeod thus failed to satisfy § 2244(b)(2)(B)(ii) and dismissal of his petition was appropriate.

IV.

Had McLeod's petition satisfied § 2244(b)(2)(B)(ii),

dismissal was nevertheless appropriate on the merits.  Under the

AEDPA,

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A.

Turning first to § 2254(d)(2), McLeod contends that the

conclusion of the Circuit Court for Prince George's County that

the State did not withhold evidence favorable to him, consisting

of Karen Clark's alleged statements to Detective LaFoille, was

an objectively unreasonable determination of the facts.  In

reaching its conclusion, the circuit court was presented with a

pure question of fact that centered primarily on whether Clark

or  LaFoille was the more credible witness.  If, consistent with

27

her testimony, Clark conveyed the information regarding Nelson to LaFoille, the State likely violated McLeod's due process rights under Brady; if not, no Brady violation occurred. But the question presented for review is a narrow one. It is whether, applying the § 2254 framework, it was objectively unreasonable for the circuit court to conclude that Clark did not convey the information regarding Nelson to LaFoille in the fall of 1991 and, as a consequence, to disregard Clark's version of events.

In the context of federal habeas challenges to state court judgments, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). See Cagle v. Branker, 520 F.3d 320, 323 (4th Cir. 2008). Discussing federal court collateral review of state court factual determinations under § 2254(d)(2), and noting federalism's call for deference, the Supreme Court in Miller-El v. Cockrell stated,

> [f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).

28

537 U.S. 322, 340 (2003). Deference, however, does not imply abandonment or abdication of judicial review and does not by definition preclude relief. Id. ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

At the circuit court's hearing on McLeod's motion to re-open the post-conviction proceedings, LaFoille testified that "everything and anything" was done to locate Nelson in the fall of 1991. (J.A. at 1041). LaFoille also testified that he did not recall meeting Clark. Clark, however, saved two message slips, dated October 14th and 22nd of 1991, both evidencing LaFoille's attempts to contact Clark. One of the message slips contains LaFoille's contact information, which he testified was both accurate and in his handwriting. It is undisputed, therefore, that some interaction between Clark and LaFoille occurred. McLeod argues that the circuit court's conclusion was unreasonable because there was no conflict between Clark's testimony that she provided LaFoille with the information regarding Nelson, and LaFoille's testimony that he did not recall meeting Clark. But simply because Clark claims to have told LaFoille certain information, which he does not recall receiving, does not mean that Clark in fact conveyed the

29

information. It is just as likely, as the circuit court found, that LaFoille does not remember receiving the information because Clark never conveyed it to him. Indeed, if Clark did not in the fall of 1991 inform LaFoille of the bandanas and knives that she connects in a variety of ways to Nelson, it makes sense that Detective LaFoille would not, twelve years later, recall meeting her.

In late 1998 or early 1999, after seeing a reference to Investigator Cordle's investigation into the death of Donna Dustin on the Bowie High School website, Clark called Cordle to discuss the deaths of Dustin, and another murder victim, Jeany Kline. During the call, Clark asked Cordle to describe the cause of Kline's death. Cordle, however, was not familiar with the details of the Kline murder which had occurred outside his jurisdiction. While nothing came of this initial call by Clark, Cordle testified that Clark was interested in locating her ex-husband, Nelson.

Clark contacted Cordle again on December 6, 2000. According to Cordle's testimony, during a December 7, 2000 meeting, Clark was once again interested in locating Nelson because Clark believed Nelson had been involved in Dustin's murder and because "she wanted some resolution of what may have happened to him." (J.A. at 905). Following this December 7th meeting, Cordle and Clark were in contact hundreds of times.

30

Throughout the course of their communications, Clark conveyed a great deal of information pertaining to her belief that Nelson was involved in a number of murders.[3] Some of the information provided by Clark to Cordle implicated Nelson in certain murders in the Bowie, Maryland area, particularly Dustin's. Regarding Nelson's involvement in the Roberson murder, Cordle testified, "I don't recall her saying that he admitted to being involved." (J.A. at 910).

At some point between December of 2000 and February of 2001 Clark told Cordle that in October of 1991 LaFoille attempted to contact her seeking to locate Nelson. However, despite Cordle's testimony that Clark was very open and detail oriented in discussing her attempts to locate Nelson and determine his involvement in the various murders, Cordle never testified that Clark told him that she provided LaFoille any information regarding Nelson's involvement in the Roberson murder.

At Clark's behest, Cordle called LaFoille at his home in Michigan on February 9, 2001. According to Cordle, during their

---

[3] In addition to her effort to link Nelson to the Roberson murder, Clark attempted to link him to the murders of Dustin, Kline, and Tom King, a man who in Clark's words was "an associate of Rick's [Nelson] that went missing." (J.A. at 961). Clark also contacted the police in an attempt to establish Nelson's role in the death of several people she claims Nelson mentioned were buried on a farm in Mitchville, Maryland. The farm was searched, but no bodies were discovered.

conversation, LaFoille "stated that when he retired he may have taken a couple of boxes [of notes] and some personal records with him when he moved out to the Midwest." (J.A. at 879). During cross-examination, LaFoille testified that he made no such assertion and that his reference to files during the conversation was to files in Maryland. Cordle's notes of the February 9th conversation read, "JW [Jimmy Weidemeyer] was very tight with Nelson." (J.A. at 1299).[4] LaFoille denied making such a statement. There were other contacts, or attempted contacts, between Cordle and LaFoille, but their extent and existence are disputed. Cordle testified that LaFoille did not return two of his phone calls, made in March and April of 2001, and further that he spoke with LaFoille at some point between February and April of 2001, but made no record of the conversation because LaFoille informed him that he was too busy to search for records regarding Nelson. LaFoille, however, testified that he returned all of Cordle's phone calls. Ultimately, the circuit court conceded that it was "perplexed by the discrepancies between the testimony of Detective LaFoille and that of Investigator Cordle." McLeod, No. CT92-0611X, slip op. at 24.

---

[4] Jimmy Weidemeyer was a suspect in the Dustin murder.

32

McLeod maintains that the inconsistencies between LaFoille's testimony and that of Cordle, and other witnesses, rendered all of LaFoille's testimony unreliable. While there were discrepancies between the testimony of LaFoille and Cordle, these discrepancies do not render unreliable that which LaFoille said. Even if LaFoille told Cordle that he "may" have documents pertaining to the Roberson case, this does not mean that he did have them. Indeed, Cordle's notes of the February 9, 2001 conversation, upon which McLeod relies in arguing that Cordle, not LaFoille, accurately testified to the content of that conversation, make no reference to LaFoille's possession of notes or files. Further, as found by the circuit court, LaFoille's testimony was bolstered by the testimony of Detective Edgar and Gwinn:

> Detective Robert Edgar, to whom Detective LaFoille reported, testified that he never heard of Karen Clark before the matter herein was filed. As the lead investigator, he was also actively involved in the search for Richard Nelson, and in the course of his interviews with Mr. Nelson's acquaintances and family members, no one directed him to, or even mentioned, Karen Clark. Similarly, Assistant State's Attorney Laura Gwinn had not heard of Karen Clark prior to the filing of this Motion.

McLeod, No. CT92-0611X, slip op. at 20-21 (internal citation omitted). Finally, while any discrepancies between the testimony of Cordle and LaFoille may bear on LaFoille's credibility, his credibility alone is not dispositive of whether

33

Clark, in fact, conveyed the information regarding Nelson to him in the fall of 1991.

After hearing Clark's testimony, in its statement of reasons, the circuit court found that,

> From her testimony, it is clear to this Court that Ms. Clark is fixated on her former husband, his whereabouts, and his actions over approximately the past twenty-five years. Ms. Clark's continued focus on Mr. Nelson, whom she has admittedly not seen since 1989, seems to have emerged with single-minded determination in 1998 when she initially contacted Investigator Cordle, some seven years after her alleged conversations with Detective LaFoille.

McLeod, No. CT92-0611X, slip op. at 18. One need only look to Clark's testimony to see the reasonableness of the circuit court's finding. Clark's description of Nelson's courtship of her is of interest. She testified that prior to their marriage, though the two never dated, Nelson stalked and beat her. According to Clark, the reason she married and subsequently had a child with Nelson was because "[h]e threatened to murder my family if I didn't." (J.A. at 959). Yet, despite this brutality, Clark repeatedly testified to her desire to locate Nelson.

Clark testified that after LaFoille contacted her in the fall of 1991, she met with him on three occasions and spoke with him on the telephone several times. According to Clark, the first face-to-face meeting occurred when LaFoille came to Clark's place of work, the McEldon Library at the University of

34

Maryland, and the two spoke for two hours. It is during this time that Clark claims to have informed LaFoille of much of the evidence McLeod contends implicates Nelson in the Roberson murder. Clark submitted an affidavit stating, and she testified that, in October of 1991 she accompanied LaFoille to the police station to look at photographs. During the third alleged meeting, Clark claims to have provided LaFoille with Nelson's address book, which she obtained in 1987. According to Clark, the address book was never returned.

Despite Clark's testimony that she met with LaFoille on three occasions, once for two hours, she could not recall his height. (J.A. at 947). In a February 2001 email to LaFoille, Clark wrote,

> I don't know if you remember me, but you came to see me in College Park to ask some questions about my ex-husband . . . which were somehow related to a case you were investigating about a woman that was murdered at Allen's Pond. I don't remember what year that was, but Rick has been missing since Sept. 1989. I was wondering if you ever managed to locate Rick, etc. I also remember discussing with you his relationship to some older members of the Pagan Motorcycle gang in Bowie as well as some other issues.

(J.A. at 1129). McLeod argued to the circuit court that LaFoille's response to the email, "I remember a lot of what you are talking about," (id.), proves he remembered speaking with Clark. As noted by the circuit court, however, LaFoille's response does not necessarily show he remembered meeting Clark.

35

In any event, acknowledging that Clark and LaFoille spoke to each other at some point does not compel the conclusion that Clark disclosed the information regarding Nelson as she now claims.

Of all of Clark's assertions, perhaps the most notable is her belated description of Nelson's behavior at what he referred to as "the shrine." While the shrine was purportedly in relation to the murder of Dustin, not Roberson, Clark's story is consistent with the lack of semen in or on Roberson's person, and the fact she was not vaginally or anally penetrated. Yet, despite her claim that she divulged a mass of information regarding Nelson in the fall of 1991, Clark, by her own admission, inexplicably neglected to inform LaFoille of what occurred when she and Nelson visited the shrine in the fall of 1980. (J.A. at 938-39, 958). Clark's first mention of the shrine was to Cordle at some point after she contacted him a second time on December 6, 2000. While Nelson's alleged behavior at the shrine is consistent with Roberson's injuries, Clark could have fabricated the story after learning the details of Roberson's murder through the media or other sources. It is also possible that Nelson was somehow involved in the Roberson murder. But inculpation of Nelson does not necessarily exculpate McLeod. At trial the State argued that McLeod may not have acted alone in murdering Roberson, and evidence of Nelson's

36

involvement in the murder does not negate the other evidence incriminating McLeod. Finally, on cross examination in 2004, Clark suddenly recalled that,

> [s]hortly before he [Nelson] went missing, my last phone call with him was basically that he had information about this [the Roberson] case. Although, nothing specifically, he didn't say the name. Although he said a woman murdered in Bowie up by Allen's Pond and that people were going to try and kill him because of what he knew.

(J.A. at 955). Yet, this critical, and damning, piece of information was omitted from Clark's affidavit, which was executed over a year earlier on August 23, 2002, describing the information she possessed implicating Nelson in the murders of Dustin, Kline and Roberson.

Based on its conclusion that LaFoille, not Clark, was the more credible witness, the circuit court found that McLeod failed to demonstrate that the State withheld evidence favorable to him in violation of <u>Brady</u>. Rejecting McLeod's contention that the circuit court's finding was objectively unreasonable under § 2254(d)(2) and (e)(1), the district court stated that,

> this court is not persuaded that the state court's findings, and in particular its determinations of credibility of the witnesses, can be called "unreasonable" by a "clear and convincing" standard in light of the entirety of the evidence presented in the state court proceedings. . . . As the fact finder, the state court weighed the credibility of the witnesses, and undertook to resolve the many conflicts in the evidence. After considering all the testimonial and documentary evidence presented, the state court concluded that LaFoille's testimony, as supported by

that of his supervisor Edgar, was more credible than, and should be weighed more significantly than, that of Clark.

McLeod, 482 F. Supp. 2d at 666.

Like the instant appeal, Cagle v. Branker involved review of a district court's dismissal of appellant's § 2254 petition challenging the credibility determination of a state court. Affirming, this court stated,

> for a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear. Indeed, "federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

Cagle, 520 F.3d at 324 (internal citation omitted). While the evidence does not compel the credibility determination reached by the state court, it certainly provides a sufficient basis for purposes of section 2254(d)(2) to support such a determination. See Wilson v. Ozmint, 352 F.3d 847, 860 (4th Cir. 2003). The circuit court witnessed first hand the testimony of Clark, LaFoille, Cordle and the other witnesses and the circuit court's statement of reasons provides a thorough review of that testimony. In deeming LaFoille the more credible witness, the circuit court did not act unreasonably, let alone commit "stark and clear error." This being the case, the presumption of correctness mandated by § 2254(e)(1) stands unrebutted. McLeod

38

has failed to show that the circuit court's factual finding resulted in a decision based on an unreasonable determination of the facts in light of the evidence as required by § 2254(d)(2).

## B.

With respect to § 2254(d)(1), McLeod argues that the circuit court erred as a matter of law in finding Fike's written statement to be immaterial under Brady. See supra p. 25. As this court has noted, § 2254(d)(1) "is quite deferential." Mosley v. Branker, 550 F.3d 312, 319 (4th Cir. 2008). To be entitled to relief, a petitioner must show that "the state court decision was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court." Robinson v. Polk, 438 F.3d 350, 354-55 (4th Cir. 2006) (citing § 2254(d)(1)). A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law or if the state court decides a case differently than th[e] [Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the

39

prisoner's case."   Id.   The circuit court committed no such error here.

For purposes of Brady, evidence withheld by the state is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  While finding the statement "at least arguably favorable to the defense," the circuit court determined that "the  justification for Ms. Fike's brother's suspicion, that being 'they are the type that may do something like that,' strains the Court's ability to conclude that such information could reasonably be taken to put the whole case in a different light as to undermine confidence in the verdict, and the Court declines to do so."   McLeod, No. CT92-0611X, slip op. at 11-12. Thus, after identifying the appropriate legal standard, the circuit court concluded that Fike's statement was not material. The district court correctly found this conclusion not to be an unreasonable application of federal law as determined by the Supreme Court, and rightly left the decision of the circuit court undisturbed.

V.

McLeod's second § 2254 petition was appropriately dismissed because it failed to satiate the demanding threshold requirement of § 2244(b)(2)(B)(ii).  Even had § 2244(b)(2)(B)(ii) been met, McLeod failed to show that the circuit court made an unreasonable factual determination under § 2254(d)(2), or unreasonably applied federal law under § 2254(d)(1). Accordingly, the judgment below is

AFFIRMED.